*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, STEWART, and HACKEL
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Michael R. HANDTE**
Private First Class (E-2), U.S. Marine Corps
*Appellant*

**No. 202000211**

Decided: 2 November 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
K. Scott Woodard

Sentence adjudged 20 May 2020 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to paygrade E-1, confinement for 13 months, and a bad-conduct discharge.

For Appellant:
*Lieutenant Commander Megan P. Marinos, JAGC, USN*

For Appellee:
*Captain Nicole A. Rimal, USMC*
*Major Kerry E. Friedwald, USMC*

Senior Judge HOLIFIELD delivered the opinion of the Court, in which Judges STEWART and HACKEL joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

HOLIFIELD, Senior Judge:

Appellant was convicted, pursuant to his pleas, of one specification each of attempted viewing of child pornography and possession of child pornography in violation of Articles 80 and 134, Uniform Code of Military Justice [UCMJ].[1] Appellant asserts two assignments of error [AOE]: (1) that the Government violated Appellant's Article 10, UCMJ, speedy trial right by failing to act with reasonable diligence and (2) that the Government failed to properly update Block 7 of the charge sheet to reflect that Appellant was in a no-pay status at the time of sentencing.[2]

We find no prejudicial error and affirm.

## I. BACKGROUND

On 21 June 2019, Lance Corporal (E-3) [LCpl] Hotel[3] found a flash drive in his barracks room. In order to identify its owner, LCpl Hotel reviewed its contents. On the flash drive, he saw pictures he suspected were child pornography, as well as pictures of Appellant. LCpl Hotel gave the flash drive to his chain of command, who forwarded it to the local Naval Criminal Investigative Service [NCIS] office. Three days later, NCIS Special Agent [SA] Lima obtained a Command Authorization for Search and Seizure [CASS] authorizing her to search the flash drive for child pornography. Additionally, SA Lima and other NCIS agents interviewed Lance Corporal Hotel and four other Marines who claimed to have seen what was on the flash drive.

_____

[1] 10 U.S.C. §§ 880, 934.

[2] We have reviewed the second AOE and find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

[3] All names used in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

The following day, after viewing the pictures on the flash drive, SA Lima interviewed Appellant. After being informed of his rights, Appellant admitted the flash drive was his and confessed to seeking and possessing child pornography during the previous 14 months. He also provided two Permissive Authorizations for Search and Seizure [PASS] authorizing the search of his residence, cell phone, and laptop computer, and the removal and retention of any items desired for investigative purposes. The next day, Appellant's command ordered him into pretrial confinement, where he remained until his sentencing.

## A. Investigation

Two days after Appellant was placed in pretrial confinement, NCIS obtained a CASS to search Appellant's electronic devices. Four electronic devices were seized from Appellant (not including the original flash drive) and sent to the Defense Cyber Crime Center [DC3] for forensic examination. DC3 received the devices a week later, on 19 July 2019.

In the meantime, SA Lima continued to investigate the case, conducting social media checks, reviewing official military personnel files, and reviewing the images located on Appellant's flash drive. After reviewing 973 images and videos found on the flash drive, SA Lima submitted 103 images and 5 videos to the National Center for Missing and Exploited Children [NCMEC] to determine whether any of the images contained known child victims. On 30 July 2019, NCMEC reported that one of the submitted images contained a known child victim. The following day the Government preferred charges against Appellant for possessing and attempting to view child pornography.

At the time charges were preferred, SA Lima was still awaiting results from DC3, which began imaging Appellant's devices on 7 August 2019. On 15 August 2019, DC3 assigned Ms. Helo as the computer forensic examiner on Appellant's case. On 21 August 2019, at DC3's request, NCIS sent DC3 a CD containing the contents of Appellant's flash drive. On 28 August 2019, DC3 finished imaging Appellant's devices and Ms. Helo began her forensic analysis.

On 5 September 2019, Ms. Helo informed SA Lima that she discovered possible evidence of child sexual abuse and explained that she would need an additional CASS to look for evidence of child sexual abuse outside of her search for child pornography. Ten days later, SA Lima submitted the CASS request to the convening authority, who approved it the same day. SA Lima immediately informed Ms. Helo of the approval, and emailed her a copy of the CASS on 23 September 2019.

Ms. Helo finished her analysis of Appellant's devices and mailed her report to NCIS on 8 October 2019. NCIS received the report a week later. That

same day SA Lima requested that 21 images obtained from Appellant's electronic devices be submitted to NCMEC for review. Due to administrative delay by NCIS in mailing the images, NCMEC did not receive the additional images until almost a month later. During this time, SA Lima investigated conversations identified by DC3 on Appellant's devices in order to locate possible victims of child sexual abuse, but was ultimately unable to do so.

On 9 December 2019, NCMEC informed NCIS that the additional images contained no known child victims. NCIS informed trial counsel of these results the same day.

## B. Preliminary Hearing and Referral of Charges

On 19 December 2019 the Government detailed a lead trial counsel to Appellant's case. The next day the Government requested the appointment of a Preliminary Hearing Officer [PHO].

Appellant made a demand for a speedy trial on 7 January 2020. A PHO was appointed a week later. The Preliminary Hearing was originally scheduled for 22 January 2020 but was delayed an additional three days at Appellant's request. The PHO filed his report on 3 February 2020. Ten days later, the charges—unchanged since preferral on 31 July 2019—were referred to a general court-martial.

## C. Arraignment and Trial

Appellant was arraigned on 28 February 2020, with his trial scheduled for 22–24 April 2020. A month before trial, the Government filed a motion to allow out-of-area witnesses to testify via video due to recently enacted COVID-19-related travel restrictions. That same day Appellant filed a motion to dismiss for violations of Article 10, UCMJ, and Rule for Courts-Martial [R.C.M.] 707.

After a motions hearing on 7–8 April 2020, the military judge denied the Government's motion for video testimony but granted a continuance until May due to witness unavailability and COVID-19 concerns. In an oral ruling on 8 April 2020 the military judge denied Appellant's motion to dismiss for speedy trial violations.

Appellant signed his plea agreement on 4 May 2020. Appellant pleaded guilty and was sentenced on 20 May 2020, 329 days after he was first placed in pretrial confinement.

## II. DISCUSSION

"[A] litigated speedy trial motion under Article 10 is not waived by a subsequent unconditional guilty plea."[4] We review Article 10, UCMJ, speedy trial claims de novo.[5] Article 10 demands that when a servicemember is placed in pretrial confinement, "immediate steps shall be taken . . . to try the person or to dismiss the charges and release the person."[6] In reviewing Article 10 claims, courts do not require "constant motion" from the Government, but do require "reasonable diligence in bringing the charges to trial."[7] This "duty imposed on the Government immediately to try an accused who is placed in pretrial confinement does not terminate simply because the accused is arraigned."[8] Rather, it extends to "at least the taking of evidence."[9]

In conducting our review, we give substantial deference to the military judge's findings of fact, reversing only if they are clearly erroneous.[10] And "our framework to determine whether the Government proceeded with reasonable diligence includes balancing the following four factors: (1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for speedy trial; and (4) prejudice to the appellant."[11]

---

[4] *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005). At trial, Appellant specifically waived his right to contest the military judge's denial of his speedy trial motion insofar as it alleged a violation of R.C.M. 707. R. at 374. However, while Appellant agreed with the military judge's incorrect statement that an unconditional plea of guilty also waives review of Appellant's claim of an Article 10 violation, we decline to treat this cursory reference as a waiver of that "fundamental, substantial, personal right." *Mizgala*, 61 M.J. at 126.

[5] *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003).

[6] Article 10(b)(1), UCMJ, 10 U.S.C. § 810.

[7] *Mizgala*, 61 M.J. at 127 (quoting *United States v. Tibbs*, 15 C.M.A. 350, 353 (C.M.A. 1965)).

[8] *Cooper*, 58 M.J. at 60.

[9] *Id.*

[10] *Mizgala*, 61 M.J. at 127.

[11] *United States v. Wilson*, 72 M.J. 347, 351 (C.A.A.F. 2013) (quoting *Mizgala*, 61 M.J. at 129 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972))).

## A. Length of Delay

The length of delay constitutes a triggering mechanism under Article 10.[12] Here, Appellant spent 329 days in pretrial confinement.[13] We conclude this delay is sufficient to trigger a full analysis using the remaining factors.

## B. Reasons for the Delay

For this factor, "different weights should be assigned to different reasons."[14] First, a deliberate effort by the Government to delay the trial in order to hamper the defense weighs heavily against the Government.[15] "[M]ore neutral reason[s] such as negligence or overcrowded courts also weigh against the Government, though less heavily."[16] "[A] valid reason, such as a missing witness, should serve to justify appropriate delay."[17] In addition, "the Government has the right (if not the obligation) to thoroughly investigate a case before proceeding to trial."[18] In contrast, "delay caused by the defense weighs against the defendant."[19] So, "outside of an explicit delay caused by the defense, the Government bears the burden to demonstrate and explain

---

[12] *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (holding that the 145-day period the appellant spent in pretrial confinement was sufficient to trigger an Article 10 inquiry); *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (holding that a 117-day period of pretrial confinement triggered a full Article 10 inquiry).

[13] We are unpersuaded by the Government's argument that Appellant has not preserved the length of delay from the time the military judge denied his speedy trial motion until the date of Appellant's trial. *See Wilson*, 72 M.J. at 325 n.4 (noting that in ruling on an Article 10 speedy trial motion the military judge calculated the length of delay from the date the accused was placed in pretrial until the anticipated trial date. On appeal, CAAF also calculated the length of delay from the date Appellant was placed in pretrial confinement until the date of trial).

[14] *Barker*, 407 U.S. at 531.

[15] *Id.*

[16] *United States v. Cooley*, 75 M.J. 247, 260 (C.A.A.F. 2016) (citing *Barker*, 407 U.S. at 531) (alterations in original; internal quotation marks omitted).

[17] *Id.*

[18] *Cossio*, 64 M.J. at 258.

[19] *Cooley*, 75 M.J. at 260 (quoting *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)).

reasonable diligence in moving its case forward in response to a motion to dismiss."[20]

The delay in this case is entirely attributable to the Government, save the three days requested by Defense that delayed the Preliminary Hearing. Thus, the Government bears the burden of showing reasonable diligence for 326 days. In ruling on Appellant's motion to dismiss, the military judge found that there were many mistakes and "oops moments,"[21] but that none of the delays were overly substantial. Furthermore, the military judge found that during the delays other actions were being taken. The military judge concluded that "although . . . the Government's motion towards trial has not been perfect, it has been reasonable under all the circumstances and there has been continual moving forward to trial."[22] We agree.

This case involved the review of multiple electronic devices containing hundreds of images and videos of potential child pornography. The investigation included coordination by three different agencies—NCIS, DC3, and NCMEC—to review the images and electronics involved. The initial flash drive contained 973 images and videos, 103 of which were sent to NCMEC for review.[23] Four additional electronic devices were investigated for possible child pornography, and 21 additional images were sent to NCMEC for review. Additionally, DC3 and NCIS spent time investigating the possibility of child sexual abuse based on information discovered on Appellant's devices.

While there were brief periods of administrative delay in submitting images and reports between agencies, the standard used to evaluate the Government's progress is not perfection, but reasonable diligence.[24] We find no unreasonable delay between Appellant's placement into pretrial confinement on 26 June 2019 and his arraignment on 28 February 2020.

We find the subsequent delay until sentencing to be reasonable, as well. Following arraignment, "a change in the speedy-trial landscape has taken place. This is because after arraignment, 'the power of the military judge to process the case increases, and the power of the [Government] to affect the

---

[20] *Id.* (citing *Mizgala*, 61 M.J. at 125).

[21] R. at 316

[22] R. at 315.

[23] Pros. Ex. 4 at 4.

[24] *Cooley*, 75 M.J. at 260.

case decreases.'"[25] In short, once Appellant was arraigned, the military judge had the "power and responsibility to force the Government to proceed with its case if justice so require[d]."[26]

The military judge scheduled Appellant's trial for 22–24 April 2020; those dates were later delayed due to nonavailability of essential government witnesses and the novel travel restrictions associated with COVID-19. The military judge specifically found these matters, along with the "health, safety, and welfare of all parties," to be "good cause to continue the case."[27] Again, we agree.

Viewing the entire period of delay, we agree with the military judge that there was no bad act by the Government, nor any intent to delay the trial. The pace of the Government's actions was not for the purpose of delaying trial or increasing the amount of time Appellant spent in pretrial confinement, but rather was dictated by the administrative burden of the investigation. We find that the reasons for the delay in this case were reasonable and that this factor favors the Government.

## C. Demand for Speedy Trial

"The [Accused's] assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the [Accused] is deprived of the right."[28] Appellant made a demand for a speedy trial on 7 January 2019, at which point he had been in pretrial confinement for 196 days. However, Appellant admits in his brief that he attempted to negotiate a plea agreement as early as 23 August 2019 and submitted a second offer to plead guilty on 17 November 2019, which was rejected the following day. We find that "the timing of [Appellant's] demand for a speedy trial"—not made until fifty days after his second attempt to negotiate a plea agreement—"affords it only slight weight in his favor."[29]

---

[25] *Cooper*, 58 M.J. at 60 (quoting *United States v. Doty*, 51 M.J. 464, 465-66 (C.A.A.F. 1999)) (alternation in original).

[26] *Id.*

[27] R. at 358

[28] *Wilson*, 72 M.J. at 353 (quoting *United States v. Johnson*, 17 M.J. 255, 259 (C.M.A. 1984)).

[29] *Id.* (a demand for speedy trial made on day 119 of confinement and 14 days after denial of an offer to plead guilty was of "slight weight" when determining the reasonableness of a total 174 days' pretrial delay).

**D. Prejudice to Appellant**

"Prejudice . . . should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect."[30] We, therefore, examine the question of prejudice in light of three important interests the Supreme Court identified in *Barker*: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern; and (3) to limit the possibility that the Defense will be impaired.[31] "Of these, the most serious is the last, because the inability of [an accused] adequately to prepare his case skews the fairness of the entire system."[32]

Appellant contends that the conditions of his pretrial confinement caused an above average amount of stress and anxiety. Specifically, Appellant focuses on the fact that during his pretrial confinement he reached his End of Active Service date, at which point his pay ceased. This unanticipated stoppage of pay, according to Appellant, caused him greater than average anxiety associated with his pretrial confinement. However, "there is no distinction between a servicemember in pretrial confinement and one in any other status. All servicemembers lose their entitlement to pay and allowances upon expiration of their enlistment contract."[33] The stoppage of Appellant's pay and allowances does not constitute oppressive pretrial confinement. While the lack of pay (and accompanying miscommunication as to why) may have caused Appellant an unexpected level of anxiety, "the confinement conditions were not unique to his case."[34]

Appellant also argues that the delay between being placed in pretrial confinement, charges being referred, and discovery being provided to him stunted his ability to prepare a defense. Specifically, Appellant claims that it was not possible for him and his trial defense counsel to properly evaluate the case without a clear understanding of the evidence. However, Appellant admitted during the hearing on his motion to dismiss that no witnesses had gone away and no memory had been lost. Rather, Appellant's counsel admitted during the hearing that he was alleging prejudice by "arguing almost entirely anxiety."[35] Furthermore, Appellant's multiple attempts to negotiate

---

[30] *Mizgala*, 61 M.J. at 129 (quoting *Barker*, 407 U.S. at 532).

[31] *Barker*, 407 U.S. at 532.

[32] *Mizgala*, 61 M.J. at 129 (quoting *Barker*, 407 U.S. at 532).

[33] *United States v. Fischer*, 61 M.J. 415, 419 (C.A.A.F. 2005).

[34] *United States v. Danylo*, 73 M.J. 183, 188 (C.A.A.F. 2014).

[35] R. at 310.

a plea agreement prior to the referral of charges undermine his claim that he and his counsel were unable to properly evaluate the case.

Appellant has not shown that his anxiety was any greater than the normal anxiety and concern associated with pretrial confinement.[36] Nor has Appellant offered any argument, apart from generalized claims, that his period of pretrial confinement impaired his defense in any way. Thus, this factor favors the Government.

Balancing these factors, we conclude that Appellant was not denied his right to a speedy trial under Article 10, UCMJ.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[37] The findings and sentence as approved by the convening authority are **AFFIRMED**.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[36] *See Wilson*, 72 M.J. at 354 (expressing CAAF's concern "not with the normal anxiety and concern experienced by an individual in pretrial confinement, but rather with some degree of particularized anxiety and concern greater than the normal anxiety and concern associated with pretrial confinement.").

[37] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859, 866.